IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

A.D., by and through his Parents,
D.C. and D.D.,
                Plaintiffs,

v.      09-cv-2939

Upper Merion Area School District,
                Defendant.

## INTRODUCTION

1. Plaintiffs, a student with disabilities and his Parents, bring this action to recover attorney's fees and costs incurred while seeking enforcement of rights conferred by Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* (the "IDEA" or the "Act"). During the administrative proceedings in this case, Plaintiffs successfully established that the Defendant Upper Merion Area School District ("District") failed to offer A.D. a free and appropriate public education ("FAPE") in the form of extended school year services ("ESY") for the Summer of 2009. Because Plaintiffs are prevailing parties within the meaning of the Act, they are entitled to recover their attorney's fees and costs pursuant to the IDEA.

## JURISDICTION

2. This action is brought pursuant to 20 U.S.C. §§ 1415(i)(3)(B) and jurisdiction is based upon 28 U.S.C. §1331.

## PARTIES

3. Plaintiff A.D. is a student who resides with his family, including Plaintiffs D.C. and D.D., in West Conshohocken, Pennsylvania and within the borders of the Upper Merion Area School District.

4. The Upper Merion Area School District is the local education agency ("LEA") that administers the public schools within the District.

## FACTS

5. The IDEA and its implementing regulations, 34 C.F.R. Part 300, require states and local school districts that receive funds under the Act to provide school age residents who have disabilities with a "free appropriate public education."

6. A.D. was in a residential placement for the 2008-2009 school year. In May, 2009, Parents requested a due process hearing seeking an appropriate ESY program.

7. Due to the expedited nature of the proceedings, the parties presented the case in approximately 4 hours on May 8, 2009.

8. Prior to the hearing, Parents' expert informed Parents that A.D. could return home for the summer of 2009. Accordingly, at the hearing on May 8, 2009, Parents presented evidence relating solely to their request for a day program that would allow A.D. to live at home during the summer. Exhibit 1 at 6, ¶ 24 (Parent expressed a strong preference that A.D. return home for the Summer)

9. The right to a FAPE includes the right to appropriate ESY services. 34 C.F.R. 300.106(a). On June 2, 2009 the Hearing Officer Linda Valentini found that the District had failed to offer A.D. a FAPE for the Summer of 2009 and ordered that the District fund an alternative program. See Exhibit 1.

10. On June 22, 2009 District Special Education Supervisor Theresa B. Carvajal indicated to Parents that the District would comply with the Hearing Officer's decision.

11. For parents who prevail in an action or proceeding under the Act, the Act authorizes a Court to award reasonable attorney's fees as part of the costs to a prevailing parent in an action or proceeding under the Act. 20 U.S.C. Sections 1415(i)(3)(B) and (C).

12. Parents have requested that the District reimburse them for fees incurred in connection with the ESY proceeding and the District has refused.

13. At times prior to the administrative proceedings, at all times during the administrative proceedings, and continuing to the present, the undersigned represented Plaintiffs, expending over 40 hours of time, and incurred litigation expenses.

14. The undersigned graduated from law school in 1989, has extensive experience in civil rights litigation, and ten years of experience in special education litigation. Her hourly rate of $250/hour is below the prevailing hourly rate for attorneys with an equal level of experience in the Philadelphia area. See, e.g., Laura P. v. Haverford Sch. Dist., 2009 U.S. Dist. Lexis 49390 (E.D. Pa. June 12, 2009).

## COUNT I

15. Plaintiffs incorporate Paragraphs 1-11 as though fully set forth herein.

16. The IDEA provides that a Court may award parents of children with disabilities who prevail in any action or "proceeding" brought under the Act their reasonable attorney's fees and related costs.

17. Plaintiffs are prevailing parties in this matter.

18. As such, plaintiffs have a right to have the School District pay for their attorneys' fees, paralegal fees, and associated costs.

19. As of June 2, 2009, Plaintiffs had incurred attorneys' fees and costs totaling over $11,432.50.

20. Plaintiffs are also incurring attorneys' fees and costs in connection with the continued prosecution of this action.

21. The failure and/or refusal by the School District to reimburse plaintiffs for their reasonable attorney's fees and costs in connection with the administrative action, the aftermath of the administrative action, and this action constitute a violation of plaintiffs' rights under the IDEA.

WHEREFORE, Plaintiffs request that this Court order the Upper Merion Area School District to pay plaintiffs their reasonable attorney's fees, paralegal fees, and related costs, including the fees and costs incurred in litigating this action, in accordance with the Motion and Affidavits that will be submitted by Plaintiffs and their counsel and to grant all other relief this Court deems appropriate.

Respectfully submitted,

REISMAN CAROLLA LLP

Dated: June 29, 2009

Catherine Merino Reisman
20 East Redman Avenue
Haddonfield NJ 08033-2315
t 856.354.0071
f 856.873.5640
creisman@reismancarolla.com

**Attorneys for A.D., D.C. and D.D.**

# EXHIBIT 1

# PENNSYLVANIA
# SPECIAL EDUCATION HEARING OFFICER

DECISION

EXPEDITED DUE PROCESS HEARING

Name of Child:
ODR #10033/08-09 LS

Date of Birth:

Date of Hearing:
May 26, 2009

CLOSED HEARING

| | |
|---|---|
| Parties to the Hearing: | Representative: |
| | Catherine Reisman, Esquire |
| | 20 East Redman Avenue |
| | Haddonfield, New Jersey 08833 |
| | |
| Upper Merion School District | Mark Fitzgerald, Esquire |
| 435 Crossfield Road | Fox Rothschild |
| King of Prussia, Pennsylvania 19406 | Suite 200  PO Box 3001 Ten |
| | Blue Bell, Pennsylvania 19422 |
| | |
| Date Record Closed: | May 28, 2009 |
| Date of Decision: | June 2, 2009 |
| Hearing Officer: | Linda M. Valentini, Psy.D. |

Background

. is a seventeen-year-old eligible student whose family resides in the Upper Merion School District (hereinafter District). He is currently unilaterally placed as a residential student at            School (hereinafter         ), a private school. There is a pending due process hearing before this hearing officer regarding the appropriateness of the District's previous offer(s) of FAPE; that matter has not yet concluded. The current matter concerns an expedited due process request from            and            (hereinafter Parents) addressing the question of whether or not the Extended School Year (ESY) program the District offered to        for Summer 2009 is appropriate.

Issues

1. Is the Extended School Year program the Upper Merion Area School District offered to            for Summer 2009 appropriate?

2. If the District's ESY program is not appropriate, what ESY program is appropriate for        ?

Findings of Fact

1.            is a seventeen-year-old eligible student whose family resides in the Upper Merion Area School District.        is classified as a student with autism, specifically Asperger's Disorder. (NT 50; SE-1)

2.        attends        , a nearby private school, as a residential student, having been unilaterally placed there by his parents on October 8, 2008 shortly after they enrolled him in the District. (SE-6)

3. The District performed a comprehensive evaluation of        and issued its report on December 23, 2008. Dr. Rand Coleman, a neuropsychologist privately engaged by the Parents to evaluate        , reviewed the District's evaluation report both as part of his own evaluation and several weeks before the hearing, said that the District's data was fine, did not indicate any specific disagreement with the District's evaluation data, and although he was not certain if he had any minor points of disagreement, overall testified that he agreed with the District's evaluation data. (NT 43, 53-54; SE-1, SE-14)

4. The IEP team developed an IEP for        on January 23, 2009, and issued a Notice of Recommended Educational Placement (NOREP) on that same date proposing to place        in a Supplemental Autistic Support program at the District's High School. The Parents rejected the proposed placement, continued

3

's residential placement at         , and initiated a due process hearing which is currently in process.[1] (SE-5; SE-6)

5.           collected regression/recoupment data on        and made a recommendation that       attend the          ESY program for Summer 2009 "to maintain acquired skills, gains in socialization with peers, and specifically to maintain organization skills needed to complete educational assignments." Although not explicitly stated in its written recommendation, the Parents' advocate several times made it clear at the May 9th meeting referenced below that          was recommending that       continue in its residential program during the summer. (SE-7, PE-6)

6. The          recommendation and the regression/recoupment data were transmitted to the District's counsel by Parents' counsel on April 11, 2009.          focused on three areas for data collection; collection was done on three days before the winter break, on three days immediately after the winter break, and on three days two weeks after the winter break. The areas and the percentages of compliance for each of the three data collection periods were as follows: Use of an assignment book to record homework assignments (60%, 60%, 60%); Turning in homework to all classes (40%, 20%, 20%); and, Staying "in program" following redirection without shutting down, no noncompliance (80%, 100%, 100%). The data shows that the only regression occurred in homework completion which was poor (40%) even before the break;       remained at the same pre-post level on use of an assignment book and actually improved in his goal of staying "in program" from 80% to 100%. (SE-7, PE-6)

7.           School is currently implementing the          IEP during the educational component of       's day. No data regarding the educational component of his programming was provided to the District from           as part of their ESY recommendation. (NT 83; PE-4)

8. On April 30, 2009, Parents' counsel sent the District's counsel a copy of the report of a private neuropsychological evaluation[2] completed by Dr. Rand Coleman. Dr. Coleman's report was not produced for purposes of ESY, but for overall programming and support purposes including but not limited to educational services. The only reference in Dr. Coleman's report to ESY was in the recommendations section, and Dr. Coleman testified that he "was recommending that just very generic, trying to say that he definitely needs an ESY program and it should address academic and social needs." The District's

---

[1] ODR #9443/08-09 LS. This hearing officer was asked by parents' counsel with no objection by district counsel to preside over the current ESY matter. (NT 90; S-6, S-8, S-16)
[2] The evaluation was not an independent educational evaluation per se, as it was requested and funded by the Parents, and the Parents and their counsel had access to a draft copy, and the Parents had input about two weeks before the final report was issued. The draft copy was completed on April 16 or 17, 2009 and both Parents and Parents' counsel, but not the District or District's counsel received a draft copy. Parents' counsel and District's counsel received the final copy about two weeks later. (NT 49-50, 124-127)

school psychologist, Mr. Snieska has no concerns with Dr. Coleman's report. (NT 54-56, 215-216; SE-14)

9. Dr. Coleman is not a certified school psychologist, but was qualified as an expert witness in the areas of psychology and neuropsychology for purposes of this hearing. Following his best practices model Dr. Coleman identified needs for ___ in the following areas: Communication (social and pragmatics); adaptive skills (including hygiene); community integration; recreation (including getting along with others); and, the social, behavioral and emotional areas (including ADHD, anxiety and dysthymia). (NT 8, 17, 28, 30-32; SE-14, PE-2)

10. Dr. Coleman testified that he had been in favor of ___ 's attending the District's ESY program as he thought it had been presented to him in his April 17th meeting with District personnel at the school, and he conveyed his approval to the Parents, but when he learned the number of weeks, days and hours the District was actually offering on the NOREP he changed his view. The District believed it had accurately conveyed the proposed ESY program to Dr. Coleman and thought that he was going to recommend the District's ESY program to the Parents. Although based on his evaluation Dr. Coleman had recommended continued placement at the ___ for the time being with the intent to revisit the placement at the end of the academic year, in terms of summer placement, he opined that "your best bet is to move them more slowly" and testified that "I think if he had an ESY program that was at the level of intensity that he needed, if that was through the public school system, that could be okay." (NT 11, 34-36, 40, 48, 50, 100-101, 163-164, 166)

11. The parties held a meeting to discuss ESY on May 5, 2009. (NT 91; SE-13)

12. During discussions at the ESY meeting and during the hearing, the District referenced only the one goal identified by ___ . However, the supervisor of special education testified that the District had substantial other information (including the District's ER, the proposed IEP, and the private neuropsychological evaluation) upon which to base its ESY decision. (NT 136, 143, 152-154, 187-188)

13. The supervisor of special education for the District sends parents an enrollment form on which to indicate whether or not their child will be attending the District's ESY program. There is no written pamphlet or other description of the program – the teachers describe the program to the parents. (NT 96; PE-4)

14. On May 6, 2009 the District wrote to the Parents, summarizing the May 5, 2008 meeting, and noting that the District "felt that it could meet ___ 's needs within the District's Summer Program". (NT 186; SE-15)

15. On May 6, 2009, the District issued a NOREP indicating that "based on the data provided to the Upper Merion Area School District by the parent from

5

School,      qualifies for ESY services and the data identifies one goal area in which      demonstrated regression. This goal is specific to homework. This goal will be addressed throughout the program offered to      this summer". (SE-6)

16. The NOREP also states that "it is proposed by the ... District that     attend the Upper Merion ESY/Skills Maintenance program. The program runs from June 29th through July 30th, Monday through Thursday. Please see the enclosed description of the proposed program. (SE-6)

17. Other than the NOREP, the only description of the proposed ESY program for     that the District gave to his Parents reads, "The Upper Merion Area School District each year invites all students who receive special education services to attend our summer program which is free to students whether they qualify for Extended School Year or not...The program will be individualized for     based on his current needs, goals and levels. Language Arts, Mathematics and Writing will be part of the academic program. Social Skills, Community Based Instruction and Organizational Skills will also be a component and addressed based on the individual students' needs." (NT 97; SE-15)

18. The District's proposed ESY program for     is only five weeks long, four days per week, for three hours per day. Three days per week are devoted to academics and one day is spent on a community outing to provide for social skills training. (NT 176-179)

19. Dr. Coleman opined that the District's proposed program, consisting of 12 hours/week of programming for 5 weeks, does not provide the breadth and intensity that     needs. Dr. Coleman would have recommended an in-district program that provided the appropriate level of support. (NT 41, 44)

20.     's achievement scores are relatively strong compared to his IQ scores as demonstrated in the District's December 2008 evaluation: WISC-IV GAI = 100, Woodcock Reading Cluster 93, Math Cluster 112, Writing Cluster 99, Total Achievement Cluster 102. (NT 218; SE-1, PE-8)

21. The students on the community outing generally are substantially more impaired in academic and other important areas than     . (NT 183-185)

22. When asked why the District had concluded that its summer program was appropriate for     , the supervisor of special education responded that the District programs for many students on the autism spectrum and looked at the District's summer program and decided that it was appropriate for him. (NT 185-

   seek a "ruling that the District must pay for a residential ESY program for         .."
   (SE-16)

24. The Parent's testimony conveyed the very strong preference that        be at home rather than in a residential program for the summer during the ESY program, provided that the ESY program was of sufficient intensity and appropriate for       . (NT 99-101, 112, 165)

25. The Parent testified that through the summer       would continue to see his own private therapist whom he sees now. (NT 117)

26. The director of student services and programs at       , who has supervised       's program since January 2009 testified that       is lacking in social skills and adaptive living skills. She opined that her experience with       suggests he needs a more intense ESY program than that offered by the District. (NT 68-71, 70)

27.       y's ESY program runs from 9:00 am to 3:00 pm, Monday through Friday, for seven weeks. The morning part of the program focuses on maintenance of academic skills (English and math) with an elective of either history or science. The afternoon focuses on skills around emotional intelligence, social skills, and group community social skill acquisition led by the clinical group. (NT 76-77, 79)

Discussion and Conclusions of Law

Burden of Proof: In November 2005 the U.S. Supreme Court held that, in an administrative hearing, the burden of persuasion for cases brought under the IDEA is properly placed upon the party seeking relief. Schaffer v. Weast, 126 S. Ct. 528, 537 (2005). The Third Circuit addressed this matter as well more recently. L.E. v. Ramsey Board of Education, 435 F.3d. 384; 2006 U.S. App. LEXIS 1582, at 14-18 (3d Cir. 2006). The party bearing the burden of persuasion must prove its case by a preponderance of the evidence. This burden remains on that party throughout the case. Jaffess v. Council Rock School District, 2006 WL 3097939 (E.D. Pa. October 26, 2006). As the Parents asked for this hearing, the Parents bear the burden of persuasion. However, application of the burden of persuasion does not enter into play unless the evidence is in equipoise, that is, unless the evidence is equally balanced so as to create a 50/50 ratio. In the instant matter, the evidence was not in equipoise.

Credibility: Hearing officers are empowered to judge the credibility of witnesses, weigh evidence and, accordingly, render a decision incorporating findings of fact, discussion and conclusions of law. The decision shall be based solely upon the substantial evidence presented at the hearing.[3] Quite often, testimony or documentary evidence conflicts; this

---

[3] Spec. Educ. Op. No. 1528 (11/1/04), quoting 22 PA Code, Sec. 14.162(f). See also, Carlisle Area School District v. Scott P., 62 F.3d 520, 524 (3rd Cir. 1995), cert. denied, 517 U.S. 1135 (1996).

is to be expected as, had the parties been in full accord, there would have been no need for a hearing. Thus, part of the responsibility of the hearing officer is to assign weight to the testimony and documentary evidence concerning a child's special education experience. Hearing officers have the plenary responsibility to make "express, qualitative determinations regarding the relative credibility and persuasiveness of the witnesses". Blount v. Lancaster-Lebanon Intermediate Unit, 2003 LEXIS 21639 at *28 (2003). This is a particularly important function, as in many cases the hearing officer level is the only forum in which the witnesses will be appearing in person.

Given the brevity of this Expedited hearing and the narrow focus of the issues, this hearing officer will just briefly comment that the witnesses called by each party were credible, and each contributed a specific piece of the fact pattern considered above. Although no one with direct knowledge of       's process of ESY regression and recoupment data collection testified, this hearing officer does feel compelled to comment upon the inadequacy of what was presented to the District and to the Parents in     's case. If regression/recoupment were the sole criteria, the       data is not supportive of     s ESY eligibility and represents a pro forma unreasoned approach to helping to assess a student in this regard.

Special Education Foundations:
Having been found eligible for special education,        is entitled by federal law, the Individuals with Disabilities Education Act as Reauthorized by Congress December 2004, 20 U.S.C. Section 600 *et seq.* and Pennsylvania Special Education Regulations at 22 PA Code § 14 *et seq.* to receive a free appropriate public education (FAPE). FAPE is defined in part as: individualized to meet the educational or early intervention needs of the student; reasonably calculated to yield meaningful educational or early intervention benefit and student or child progress; provided in conformity with an Individualized Educational Program (IEP).

A student's special education program must be reasonably calculated to enable the child to receive meaningful educational benefit at the time that it was developed. (Board of Education v. Rowley, 458 U.S. 176, 102 S. Ct. 3034 (1982); Rose by Rose v. Chester County Intermediate Unit, 24 IDELR 61 (E.D. PA. 1996)). Districts need not provide the optimal level of service, maximize a child's opportunity, or even a level that would confer additional benefits. What the statute guarantees is an "appropriate" education, "not one that provides everything that might be thought desirable by 'loving parents.'" Tucker v. Bayshore Union Free School District, 873 F.2d 563, 567 (2d Cir. 1989). If personalized instruction is being provided with sufficient supportive services to permit the student to benefit from the instruction the child is receiving a "free appropriate public education as defined by the Act." Polk, Rowley. More recently, the Eastern District Court of Pennsylvania ruled, "districts need not provide the optimal level of services, or even a level that would confer additional benefits, since the IEP required by the IDEA represents only a basic floor of opportunity." S. v. Wissahickon Sch. Dist., 2008 WL 2876567, at *7 (E.D.Pa., July 24, 2008), citing Carlisle, 62 F.3d at 534, citations omitted. See also, Neena S. ex rel. Robert S. v. School Dist. of Philadelphia, 2008 WL 5273546, 11 (E.D.Pa., 2008).

Acknowledging that some students may require programming beyond the regular school year, under the federal legislature deemed that Extended School Year services are to be provided to an eligible student if necessary to assure that he receives a free, appropriate public education (FAPE). 34 C.F.R. §300.106(a)(2). Pennsylvania regulations provide additional guidance for determining ESY eligibility, requiring that the factors listed in 22 Pa. Code §14.132 (a)(2) (i)—(vii) be taken into account.

22 Pa. Code § 14.132(a)(2) (i)—(vii) provides in relevant part:

> (a) In addition to the requirements incorporated by reference in 34 CFR 300.106 (relating to extended school year services), school entities shall use the following standards for determining whether a student with disabilities requires ESY as part of the student's program:
>
> (1) At each IEP meeting for a student with disabilities, the school entity shall determine whether the student is eligible for ESY services and, if so, make subsequent determinations about the services to be provided.
>
> (2) In considering whether a student is eligible for ESY services, the IEP team shall consider the following factors; however, no single factor will be considered determinative:
>
> (i) Whether the student reverts to a lower level of functioning as evidenced by a measurable decrease in skills or behaviors which occurs as a result of an interruption in educational programming (Regression).
>
> (ii) Whether the student has the capacity to recover the skills or behavior patterns in which regression occurred to a level demonstrated prior to the interruption of educational programming (Recoupment).
>
> (iii) Whether the student's difficulties with regression and recoupment make it unlikely that the student will maintain the skills and behaviors relevant to IEP goals and objectives.
>
> (iv) The extent to which the student has mastered and consolidated an important skill or behavior at the point when educational programming would be interrupted.
>
> (v) The extent to which a skill or behavior is particularly crucial for the student to meet the IEP goals of self-sufficiency and independence from caretakers.
>
> (vi) The extent to which successive interruptions in educational programming result in a student's withdrawal from the learning process.
>
> (vii) Whether the student's disability is severe, such as autism/pervasive developmental disorder, serious emotional disturbance, severe mental retardation, degenerative impairments with mental involvement and severe multiple disabilities.

(b) Reliable sources of information regarding a student's educational needs, propensity to progress, recoupment potential and year-to-year progress may include the following:

(1) Progress on goals in consecutive IEPs.

(2) Progress reports maintained by educators, therapists and others having direct contact with the student before and after interruptions in the education program.

(3) Reports by parents of negative changes in adaptive behaviors or in other skill areas.

(4) Medical or other agency reports indicating degenerative-type difficulties, which become exacerbated during breaks in educational services.

(5) Observations and opinions by educators, parents and others.

(6) Results of tests, including criterion-referenced tests, curriculum-based assessments, ecological life skills assessments and other equivalent measures.

(c) The need for ESY services will not be based on any of the following:

(1) The desire or need for day care or respite care services.

(2) The desire or need for a summer recreation program.

(3) The desire or need for other programs or services that, while they may provide educational benefit, are not required to ensure the provision of a free appropriate public education.

In determining whether the District has offered an appropriate ESY program, as is the case for determining whether a District has offered an appropriate IEP, the proper standard is whether the proposed program is reasonably calculated to confer meaningful educational benefit. Rowley "Meaningful benefit" means that an eligible student's program affords him or her the opportunity for "significant learning." *Ridgewood Board of Education v. N.E.*, 172 F.3d 238 (3RD Cir. 1999).

Almost 30 years ago, in *Battle v. Pennsylvania*, 629 F.2d 269 (3d Cir. 1980), *cert. denied*, 452 U.S. 968 (1981), the federal courts declared unequivocally that school districts must determine ESY services on an *individualized* basis and consider all components of a student's educational needs. The Pennsylvania Department of Education Basic Education Circular on Extended School Year services specifically directs the IEP team to consider the extent to which students have mastered and consolidated specific skills. Further, the team must consider the extent to which a skill or behavior is particularly crucial for the student to meet the IEP goals of self-sufficiency or independence from caretakers.

Here, eligibility is not an issue with respect to a summer program for     . The District determined that he is eligible for ESY based upon his being a member of the target group and upon his needs as put forth in the District's December 2008 evaluation, the January 2009 IEP that is in evidence, as well as Dr. Coleman's report. Having determined that he was eligible for ESY services, the District was obligated to develop an ESY program for him. In the instant matter, the District did offer a program. The only issue to be determined is whether the District offered an appropriate program. This hearing officer has determined that it did not.

What the District failed to do, and the reason that its ESY offer is inappropriate for     is take into consideration this Student's individualized situation of having spent several years in residential programming and his need for a more lengthy and intense period of summer day programming to allow for his transition difficulties and address his skill maintenance needs. By failing to consider this factor the District far undershot its estimate of the appropriate length and intensity of an ESY program for him. Additionally and equally as important the District offered a one-size-fits all ESY program that was inappropriate because it underemphasized social skills, communication skills, community integration improvement, and consistent instruction, all of which     does need. Rendering its proposed ESY program even more inappropriate, its meager offer of three hours once a week for five weeks of socialization was intended to be carried out with peers who are cognitively impaired and thus not a true peer group for     .

The District's ESY program is the same as that offered to all special education students. It is apparent that     has many needs, and the District has unlawfully limited the type, amount, and duration of services available to     by confining the options to a cookie-cutter ESY program offered to all students who receive special education within the Upper Merion Area School District, whether or not they actually qualify for ESY. Granted, the District has not had the opportunity to have     in attendance, but it has access to a wealth of information it could have used to craft an appropriate individualized ESY program. Instead, without developing any specific goals or objectives for his instruction, or taking into consideration that     would be coming to its program from several years of residential placement, the District proposed for     the ESY program it offers to all its special education high school students. The only description of the ESY program specifically offered to     was a reference to "the goal identified by The     School"; notably that goal was homework completion.[4] As regards what content     would actually receive under the District's program, this hearing officer finds herself in the same position as another hearing officer was in ODR No. 9015/07-08 AS (August 2008), "Since the District's proposed program is completely devoid of content, it is impossible to reach a reasoned conclusion that the District's proposal for

---

[4] This hearing officer here notes her astonishment that given its 24 hour a day programming for     the only goals     tracked for regression/recoupment were use of an assignment book, homework completion and engagement in program, suggesting at best a poor pro forma attempt to comply with the requirement for data collection. Compounding     's error to its own detriment, the District made a poor decision when it chose this goal to address during the summer rather than any of the substantive areas identified in its own extensive ER and IEP. (S-15)

11

ESY would have provided Student with "meaningful benefit," *i.e.*, the opportunity for "significant learning," as required by Ridgewood."

In determining the scope of 's ESY eligibility, the District should have, but did not, take into account his disability, and the recent evaluation it conducted, which revealed deficits in social and behavioral functioning. The District offered an ESY program that focused 75% of its efforts on academics, although not one of his reading, mathematics or writing test scores reported on the December 2008 evaluation was significantly below average or below his cognitive ability. The District chose to offer a program that devoted only 25% of its focus to socialization and adaptive skills, a total of 15 hours, all of which were to be in the company of peers that have substantial cognitive limitations.

The inference this hearing officer drew directly from the testimony of the District witnesses and the documents in evidence is that instead of carefully considering 's specific individual needs, the District only considered its standard program for him.

In contrast, the ESY program offered by is appropriate in terms of the length of time and the areas of concentration. Attendance as a summer day student at was favored by the Parent in her testimony, and by the Parents' expert by inference, as he would have remained supportive of the District's day program if it had been of sufficient length and intensity. This hearing officer is in agreement that a day ESY program at is appropriate for and will so order.

Conclusion

Based upon the evidence presented at the expedited due process hearing in this matter, and the applicable law relating to ESY eligibility and appropriate programs and services, the Upper Merion Area School District will be required to reimburse Student's Parents for the costs they will incur in providing the Day ESY program for during the summer of 2009, including transportation costs at the same rate of mileage reimbursement the District provides to its own employees when traveling.

Finally, as this Decision will reflect and as this hearing officer wishes to make clear, information gleaned from the pending larger due process matter was not used in rendering this Decision. That having been said, after making her determination this hearing officer did then consider what impact the decision she had made regarding 's ESY program would have upon him given the various possible outcomes of the larger pending case. In addition to being a legally sound outcome, this hearing officer believes that given the District's offer of ESY was not appropriate, her decision to order the District to fund a non-residential ESY program at offers the following advantages: 1) If the outcome in the larger matter is that the Parents prevail completely and the District is ordered to fund the residential program during the 2009-2010 school year, summer day programming at will provide a familiar interlude between the end of the residential program in June and the resumption of the residential program in September; 2) if the outcome in the larger matter is that the and the District each partially prevail and the District is ordered to fund a day program at

, the summer program will allow         to become accustomed to an experience that he has not had since eighth grade, i.e. leaving for school in the morning and coming home to his family in the afternoon; 3) if the District prevails, and the Parents decide not to continue       's placement at        at their own expense but allow him to attend school in the District, he again will have become accustomed to being in school during the day and at home in the afternoon and evening such that the sole transition to be accomplished will be the change in the setting in which his special education program is delivered rather than both a transition of schools and a transition of living arrangements. The option of an ESY program not in the District and not in        , for example at        , would not be helpful in light of the possible outcomes of the larger due process matter.

Order

It is hereby ordered that:

1. The Extended School Year program the Upper Merion Area School District offered to         for Summer 2009 is not appropriate.

2. The Upper Merion Area School District must fund        's participation in the Summer 2009 ESY day program offered by         for a total of seven weeks, five days per week, six hours per day.

3. The Upper Merion Area School District must reimburse the Parents for the cost of transporting       to and from the        ESY day program at the same rate of mileage reimbursement the District provides to its own employees when traveling.


June 2, 2009
Date

*Linda M. Valentini, Psy.D.*
Linda M. Valentini, Psy.D.
Hearing Officer